United States Court of Appeals United States Court of Appeals
For the First Circuit For the First Circuit


Nos. 96-1015
96-1068

ROLAND C. DUBOIS and RESTORE: THE NORTH WOODS,

Plaintiffs, Appellants,

v.

DEPARTMENT OF AGRICULTURE, UNITED STATES, ET AL.,
and LOON MOUNTAIN RECREATION CORPORATION,

Defendants, Appellees.


ERRATA SHEET

The opinion of this Court is amended as follows:

Cover sheet: Replace case number "96-1086" with "96-1068".

United States Court Of Appeals United States Court Of Appeals
For the First Circuit For the First Circuit


Nos. 96-1015
96-1068

ROLAND C. DUBOIS and RESTORE: THE NORTH WOODS,

Plaintiffs, Appellants,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ET AL.,
and LOON MOUNTAIN RECREATION CORPORATION,

Defendants, Appellees.


APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Paul J. Barbadoro, U.S. District Judge] 


Before

Selya, Circuit Judge, 

Coffin and Bownes, Senior Circuit Judges. 


Roland C. Dubois pro se. 
Cindy Ellen Hill for appellant RESTORE: The North Woods. 
Jeffrey P. Kehne, Attorney, with whom Lois J. Schiffer, Assistant 
Attorney General, Sylvia Quast, John A. Bryson, Attorneys, Environment 
& Natural Resources Division, U.S. Department of Justice, Washington,
DC, Paul M. Gagnon, United States Attorney, T. David Plourde, 
Assistant United States Attorney, Concord, NH, Wendy M. John, Stuart 
L. Shelton, Office of the General Counsel, U.S. Department of 
Agriculture, Washington, DC, and Leslie M. Auriemmo, Office of the 
General Counsel, U.S. Department of Agriculture, Milwaukee, WI, were
on brief for appellees U.S. Department of Agriculture; Daniel
Glickman, Secretary, U.S. Department of Agriculture; Jack Ward Thomas,
Chief, U.S. Forest Service; Robert Jacobs, Regional Forester, Eastern
Region, U.S. Forest Service; Donna Hepp, Forest Supervisor, White 

Mountain National Forest.
James L. Kruse with whom Gallagher, Callahan & Gartrell, P.A., 
were on brief for appellee Loon Mountain Recreation Corporation.



December 19, 1996


- 3 -

BOWNES, Senior Circuit Judge. The defendant- BOWNES, Senior Circuit Judge. 

intervenor Loon Mountain Recreation Corporation ("Loon

Corp.") operates a ski resort in the White Mountain National

Forest in Lincoln, New Hampshire. In order to expand its

skiing facilities, Loon Corp. sought and received a permit to

do so from the United States Forest Service.1 Appellant

Roland Dubois sued the Forest Service alleging violations of

the National Environmental Policy Act ("NEPA"), 42 U.S.C. 

4321, et seq., the Clean Water Act ("CWA"), 33 U.S.C. 1251, 

et seq., the Administrative Procedure Act, 5 U.S.C. 501, et 

seq. ("APA"), and Executive Order 11,990, 42 Fed. Reg. 26,961 

(1977), reprinted as amended in 42 U.S.C.A. 4321 (West 

1994). Appellant RESTORE: The North Woods ("RESTORE")

intervened as a plaintiff claiming violations of the same

statutes, and appellee Loon Corp. intervened as a defendant.

Dubois and RESTORE (collectively referred to as "plaintiffs")

and the Forest Service filed cross-motions for summary

judgment, and Loon moved to dismiss. The district court

granted the Forest Service's motion for summary judgment and

denied the other motions. We affirm in part, reverse in

part, and remand.

 

1. The Forest Service, its parent organization, the United
States Department of Agriculture, and their agents will be
collectively referred to as "the Forest Service" throughout
this opinion.

-4-

I. STATEMENT OF THE CASE I. STATEMENT OF THE CASE 

A. Facts A. Facts 

The White Mountain National Forest ("WMNF") is a

public resource managed by the United States Forest Service

for a wide range of competing public uses and purposes,

including "outdoor recreation, range, timber, watershed, . .

. wildlife and fish purposes," 16 U.S.C. 528 (1994), and

skiing, 16 U.S.C. 497(b) (1994). Pursuant to the National

Forest Management Act of 1976, the Forest Service makes long-

term plans to coordinate these competing uses, 16 U.S.C.

1604(e)(1) (1994), and issues "special use" permits

authorizing private recreational services on national forest

land, 36 C.F.R. 251.50-.65 (1995). The Forest Service's

exercise of its permitting authority is legally constrained

by environmental considerations emanating, inter alia, from 

NEPA, the CWA, and Executive Order 11,990.

Loon Pond is located in the WMNF at an elevation of

2,400 feet. It has a surface area of 19 acres, with shallow

areas around the perimeter and a central bowl 65 feet deep.

It is unusual for its relatively pristine nature. There is

virtually no human activity within the land it drains except

skiing at the privately owned Loon Mountain Ski Area. New

Hampshire Department of Environmental Services ("NHDES")

regulations classify Loon Pond as a Class A waterbody,

protected by demanding water quality standards under a

-5-

variety of criteria, see N.H. Code Admin. R. Env-Ws 432.03, 

and as an Outstanding Resource Water ("ORW"), protected

against any measurable long-term degradation by the State's

anti-degradation rules, see id. 437.06; 40 C.F.R.  

131.12(a)(3) (1995). It ranks in the upper 95th percentile

of all lakes and ponds in northern New England for low levels

of phosphorus, which results in limited plant growth and

therefore high water clarity and higher total biological

production. The pond supports a rich variety of life in its

ecosystem. Loon Pond also constitutes a major source of

drinking water for the town of Lincoln 1,600 feet below it.

A dam across the outlet of the Pond regulates the flow of

water from the Pond to Lincoln's municipal reservoir.

Loon Corp., defendant-intervenor herein, owns the

Loon Mountain Ski Area, which has operated since the 1960s

not far from Loon Pond. Prior to the permit revision that

gave rise to this litigation, Loon Corp. held a special use

permit to operate on 785 acres of WMNF land. That permit

allowed Loon Corp. to draw water ("drawdown") for snowmaking

from Loon Pond, as well as from the East Branch of the

Pemigewasset River ("East Branch") and from nearby Boyle

Brook. In order to use water from Loon Pond, Loon Corp. also

needed authorization from the Town of Lincoln and the State

of New Hampshire. Beginning in 1974, Loon Corp. was

authorized to pump snowmaking water from Loon Pond down to 18

-6-

inches below full level.2 A 1988 amendment to this agreement

permitted drawdown below the 18-inch level on a case-by-case

basis. Combined uses by Lincoln and Loon Corp. during the

period governed by these agreements typically caused four- to

six-foot fluctuations in the level of Loon Pond.

In addition to being used as a source of water for

snowmaking, Loon Pond has been the repository for disposal of

water after it is pumped through the snowmaking system.3

This includes water that originally came from Loon Pond, as

well as water that originated in the East Branch or in Boyle

Brook. Approximately 250,000 gallons of East Branch water

have been transferred into Loon Pond each year in this

manner. Obviously the water discharged into Loon Pond

contains at least the same pollutants that were present in

the intake water. Evidence in the record indicates that

intake water taken from the East Branch contains bacteria,

other aquatic organisms such as Giardia lambia, phosphorus,

turbidity and heat. Evidence was also introduced in court,

but not available prior to the issuance of the Environmental

 

2. The level of Loon Pond drops when Pond water is used for
snowmaking, because the Pond does not receive much natural
water through precipitation during the winter.

3. In order for Loon Corp. to make snow, it must pump
significantly more water through the system than is actually
made into snow. Passing this extra water through the pipes
keeps them from freezing. It also provides the pressure that
forces the artificial snow out through snowmaking jets.

-7-

Impact Statement ("EIS"), that oil and grease were present in

the discharge water, although their source was disputed. 

In 1986, Loon Corp. applied to the Forest Service

for an amendment to its special use permit to allow expansion

of its facilities within the WMNF. Pursuant to NEPA, 42

U.S.C. 4332, the Service developed a draft EIS, and a

supplement to the draft. Responding to criticism of the

adequacy of those documents, the Forest Service issued a

revised draft EIS ("RDEIS"), which was published for public

comment. The RDEIS set forth five alternatives to meet the

perceived demand for additional alpine skiing. All five were

located at the Loon Mountain site.4 

Many individuals and groups, including both

plaintiffs, filed comments pointing out various environmental

problems with each alternative that involved expanding the

ski area. One lengthy comment from the U.S. Environmental

Protection Agency ("EPA") expressed its concern that the use

of Loon Pond for snowmaking purposes would "use Loon Pond

like a cistern" instead of treating it "with care" because it

is "acknowledged to be one of the rare high altitude ponds of

its size in the White Mountains." Joint Appendix ("JA"),

 

4. The Forest Service's ten-year plan for the WMNF, issued
in 1986, included plans for accommodating increased demand
for downhill skiing. It determined that it would meet this
demand through expansion of existing ski areas rather than
through the creation of new ones. It did not discuss the
possibility of meeting the demand through alternative sites
outside the national forest.

-8-

vol. II, Response to Public Comment on RDEIS at A-78. Other

commenters suggested that Loon Corp. be required to build

artificial water storage ponds, in order to eliminate the

problem of depleting Loon Pond when withdrawing water for

snowmaking as well as the problem of adding pollutants to

Loon Pond when discharging water into the Pond after use.

During the EIS process, Ron Buso, a hydrologist for

the WMNF, expressed concern to another Forest Service

hydrologist that the proposed drawdown of Loon Pond by twenty

feet was likely to have a severe impact on the Pond. He

explained that natural snowmelt in New Hampshire is extremely

acidic and that, as a result of the planned drawdown, a

substantial amount of acidic snowmelt would remain in Loon

Pond, increasing the Pond's acidity by a factor of two to

three times what it would be without the planned drawdown.

Without the drawdown, Loon Pond would be relatively full in

the spring, and much of the snowmelt from surrounding higher

elevations would glide over the surface of the Pond and down

the mountain without significantly mixing with other Loon

Pond water. According to Buso and a number of scientists

whose affidavits were submitted to the district court, the

increase in the Pond's acidity due to the planned drawdown

would change the chemistry of the Pond, cause toxic metals to

-9-

be released from the sediment, and kill naturally occurring

organisms.

Without addressing the issues raised in the Buso

memorandum or in the comments suggesting artificial storage

ponds, the Forest Service prepared a Final EIS ("FEIS"). The

FEIS added a sixth alternative, also on the Loon Mountain

site. The new alternative provided for expansion of Loon

Corp.'s permit area by 581 acres and for the construction of

one new lift and approximately 70 acres of new ski trails,

changes designed to accommodate 3,200 additional skiers per

day (from the current 5,800 per day). The Forest Service

deemed Alternative 6 as the preferred alternative. Under it,

Loon Corp. would more than double the amount of water used

for snowmaking, from 67 million gallons per year to 138

million gallons. Seventeen million gallons of the increase

would be drawn from the East Branch, and 54 million gallons

from Loon Pond. In addition, Loon Corp. was authorized to

draw the Pond down for snowmaking by fifteen feet, compared

to the current eighteen inches. The Forest Service assumed

that the Town of Lincoln would need up to an additional five

feet of Pond water, making a total of twenty feet that the

Pond was expected to be drawn down each year. This would

constitute approximately 63% of the Pond's water. In March

1993, the Forest Service published a Record of Decision (ROD)

adopting Alternative 6.

-10-

As a mitigation measure to blunt the adverse

environmental impact on Loon Pond, the Forest Service

required Loon Corp. to pump water from the East Branch to

Loon Pond in December and May of each year if the Pond was

not otherwise full at those times. In its FEIS, the Forest

Service recognized that the East Branch is a relatively

unprotected Class B waterway under New Hampshire law, and

that transfer of East Branch water to Loon Pond, a protected

Class A waterbody and Outstanding Resource Water under state

and federal law, would introduce pollutants into the Pond.

Accordingly, it specified that this transfer of East Branch

water could not occur if it exceeded certain levels of

turbidity, bacteria, or oil and grease. Neither the FEIS nor

the ROD set any limits, however, on the level of non-

bacterial organisms such as Giardia lambia or on pollutants

such as phosphorus that may be present in the transferred

water. Nor did the FEIS indicate an alternative means of

refilling Loon Pond -- with clean water -- if conditions were

such that the transfer of East Branch water would exceed the

specified levels.5 It did, however, provide a series of

restrictions and monitoring requirements for water levels and

 

5. As noted supra, absent some other method of refilling, 
the Pond would be refilled by the melting of acidic snow.

-11-

water quality, including daily testing of the transferred

water for turbidity, bacteria, and oil and grease.6

Dubois and RESTORE appealed the ROD to the Regional

Forester and, thereafter, to the Chief of the Forest Service.

These appeals were denied. On March 16, 1994, the Forest

Service issued a special use permit to Loon Corp.,

implementing the decision described in the ROD.

B. Proceedings Below B. Proceedings Below 

Plaintiff Dubois filed a complaint in the United

States District Court for the District of Columbia,7

challenging the Forest Service's approval of the Loon

Mountain expansion project. He made three arguments.8

First, he argued that the Forest Service actions violated the

CWA because they would lead to violations of state water

quality standards which, he asserted, have the effect of

federal law because they were approved by the federal EPA.

Second, he argued that the Forest Service violated both NEPA

 

6. In response to an earlier draft EIS, the EPA had
expressed the following concern: "While monitoring plans
have merit, they should not be considered a substitute for a
thorough evaluation of a project and its potential impacts
prior to action approval." JA, vol. I, at 97; see also 
Massachusetts v. Watt, 716 F.2d 946, 951-52 (1st Cir. 1983) 
(NEPA "requires an EIS according to its terms," before the
agency becomes "committed to [a] previously chosen course of
action").

7. The case was later transferred to the United States
District Court for the District of New Hampshire.

8. Plaintiffs made other arguments below, but have not
pursued them on appeal.

-12-

and Executive Order 11,990 by failing to consider

alternatives to the use of Loon Pond and failing to develop

adequate mitigation measures. Finally, he argued that the

Forest Service violated the CWA, 33 U.S.C. 1311, by failing

to obtain a National Pollutant Discharge Elimination System

("NPDES") permit before approving Loon Corp.'s expansion

plans, which entailed removing water from the East Branch,

using it to pressurize and prevent freezing in its snowmaking

equipment, and then discharging the used water into Loon

Pond. According to Dubois, an NPDES permit was required in

order for Loon Corp. to discharge pollutants into Loon Pond,

including the discharge from Loon Corp.'s snowmaking

equipment. Plaintiff RESTORE, a membership organization,

intervened on behalf of its members to challenge the project.

RESTORE first reiterated Dubois' claim that an NPDES permit

was required. In addition, RESTORE claimed that the Forest

Service violated NEPA by failing to prepare a Supplemental

EIS after it developed Alternative 6 as the preferred

alternative. According to RESTORE, this new alternative, not

specifically mentioned in the previously published draft EIS

or RDEIS, contained substantial changes to the proposed

action that are relevant to environmental concerns, which

required a supplemental EIS under NEPA and relevant

implementing regulations. Finally, RESTORE claimed that a

supplemental EIS was required because the Forest Service's

-13-

Final EIS failed to "rigorously explore and objectively

evaluate all reasonable alternatives" that are capable of

meeting the stated goals of the project, as required by 40

C.F.R. 1502.14 (1995). According to RESTORE, the asserted

goal of meeting skier demand could have been met by expanding

ski areas other than Loon, in particular, ski areas located

outside the White Mountain National Forest.

The parties cross-moved for summary judgment. Loon

Corp. intervened, and moved to dismiss on the ground that

both plaintiffs lacked standing. The district court denied

Loon Corp.'s motion to dismiss, granted summary judgment for

the Forest Service, and denied the plaintiffs' cross-motions

for summary judgment.

II. DUBOIS' STANDING9 II. DUBOIS' STANDING 

The ingredients of standing are imprecise and not

easily susceptible to concrete definitions or mechanical

applications. Allen v. Wright, 468 U.S. 737, 751 (1984). In 

order to have standing to sue, a plaintiff must have "such a

personal stake in the outcome of the controversy as to assure

that concrete adverseness which sharpens the presentation of

issues upon which the court so largely depends for

illumination of difficult . . . questions." Baker v. Carr, 

369 U.S. 186, 204 (1962). 

 

9. Defendants have abandoned their challenge to RESTORE's
standing.

-14-

Standing consists of both a constitutional aspect

and a prudential aspect. The constitutional dimension

derives from the requirement that federal courts can act only

upon a justiciable case or controversy. U.S. Const. art.

III. If a party lacks Article III standing to bring a matter

before the court, the court lacks subject matter jurisdiction

to decide the merits of the underlying case. FW/PBS, Inc. v. 

City of Dallas, 493 U.S. 215, 231 (1990). 

To satisfy the constitutional component of

standing, a plaintiff must have suffered an "injury in fact,"

i.e., an invasion of a legally protected interest. Lujan v. 

Defenders of Wildlife, 504 U.S. 555, 560 (1992). That injury 

must be "concrete and particularized"; the latter term means

the injury must be personal to the plaintiff. Id. at 560 & 

n.1. It may be shared by many others, United States v. 

Students Challenging Regulatory Agency Procedures (SCRAP), 

412 U.S. 669, 687-88 (1973), but may not be common to

everyone, see Warth v. Seldin, 422 U.S. 490, 499 (1975). The 

injury must also be "actual or imminent, not conjectural or

hypothetical," Defenders of Wildlife, 504 U.S. at 560 

(quotation omitted), and it must be "distinct and palpable,"

Warth, 422 U.S. at 501. The latter requirement may be 

satisfied by environmental or aesthetic injuries. See SCRAP, 

412 U.S. at 686; Sierra Club v. Morton, 405 U.S. 727, 734 

(1972). The injury need not be "significant"; a "small"

-15-

stake in the outcome will suffice, if it is "direct." SCRAP, 

412 U.S. at 689 n.14. In addition, the injury must be fairly

traceable to the defendant's allegedly unlawful conduct and

likely to be redressed by the requested relief.10 Defenders 

of Wildlife, 504 U.S. at 560-61. 

The doctrine of standing also includes prudential

concerns relating to the proper exercise of federal

jurisdiction. Among these concerns is the requirement that

"a plaintiff's complaint fall within the zone of interests

protected by the law invoked." Allen, 468 U.S. at 751. In 

addition, as a general rule, a plaintiff "must assert his own

legal rights and interests, and cannot rest his claim to

relief on the legal rights or interests of third parties."

Warth, 422 U.S. at 499. A membership organization 

constitutes an exception to this general rule: it may assert

the claims of its members, provided that one or more of its

members would satisfy the individual requirements for

 

10. Violations of procedural rights, such as those created
by NEPA and CWA, receive "special" treatment when it comes to
standing. "The person who has been accorded a procedural
right to protect his concrete interests can assert that right
without meeting all the normal standards for redressability
and immediacy." Defenders of Wildlife, 504 U.S. at 572 n.7. 
As an example, the Supreme Court points to "the procedural
requirement for an environmental impact statement before a
federal facility is constructed next door" to the plaintiffs.
Id. at 572. The contrasting example -- where the disregard 
of procedural requirements would be held not to impair the 
plaintiffs' concrete interests -- is "persons who live (and
propose to live) at the other end of the country" from the
project. Id. at 572 n.7. 

-16-

standing in his or her own right.11 See UAW v. Brock, 477 

U.S. 274, 281-82 (1986).

The burden falls on the plaintiff "clearly to

allege facts demonstrating that he is a proper party to

invoke" federal jurisdiction. Warth, 422 U.S. at 518. The 

plaintiff must "set forth reasonably definite factual

allegations, either direct or inferential, regarding each

material element needed to sustain standing." United States 

v. AVX Corp., 962 F.2d 108, 115 (1st Cir. 1992). "[E]ach 

element must be supported in the same way as any other matter

on which the plaintiff bears the burden of proof, i.e., with 

the manner and degree of evidence required at the successive

stages of the litigation." Defenders of Wildlife, 504 U.S. 

at 561. At the pleading stage, "general factual allegations

of injury resulting from the defendant's conduct may suffice,

for on a motion to dismiss we 'presum[e] that general

allegations embrace those specific facts that are necessary

to support the claim.'" Id. (quoting Lujan v. National 

Wildlife Federation, 497 U.S. 871, 889 (1990)). 

The district court denied Loon Corp.'s motion to

dismiss Dubois' claims on standing grounds, relying on our

 

11. An association must meet two other requirements in order
to have standing to sue: the interests that the suit seeks
to vindicate must be germane to the objectives for which the
organization was formed; and neither the claim asserted nor
the relief requested requires the personal participation of
affected individuals. UAW v. Brock, 477 U.S. 274, 282 
(1986).

-17-

precedent in Washington Legal Found. v. Massachusetts Bar 

Found., 993 F.2d 962, 971-72 (1st Cir. 1993). In that case, 

we held that the court need not determine the standing of all

plaintiffs if at least one plaintiff has standing to maintain

each claim. The district court found that RESTORE had

standing to bring all the claims at issue in this case, and,

therefore, that the court could reach the merits of all

claims without first addressing Dubois' standing. We agree

that RESTORE would have standing to raise, on behalf of its

members, all the issues in dispute in this litigation. But

the district court erred in concluding that it could

therefore reach the merits of all claims, because the

district court's premise was incorrect: RESTORE did not,

even at the district court level, raise the issues relating

to Executive Order 11,990 and the state water quality

standards, which only Dubois is pursuing here. The situation

is not, therefore, analogous to Washington Legal Foundation; 

if Dubois has no standing, we cannot decide issues that

RESTORE has never raised.

We find, however, that Dubois does satisfy all

requirements for standing to litigate the claims he seeks to

-18-

pursue on appeal. His second amended complaint12 alleged

that

[his] principal residence from 1959-1977
was in Lincoln, New Hampshire. [He] has
returned to the Lincoln area at least
once per year -- and occasionally up to
twelve or more times per year -- since
1977. During these trips, [he] has
visited relatives and friends, collected
botanical samples for scientific
analysis, and engaged in recreational
activities in and around the WMNF and the
Loon Mountain Ski Area. Plaintiff's
interest in the environmental,
recreational and aesthetic quality of the
WMNF are and will be adversely affected
by the Defendants' actions challenged in
this Complaint. 

Second Amended Complaint, 5. The last sentence is rather

conclusory, but the entire complaint, taken together with

inferences reasonably drawn from its allegations, contains

sufficient "reasonably definite factual allegations," AVX, 

962 F.2d at 115, to survive a motion to dismiss. 

"We are mindful that, under the notice pleading

requirements of the federal rules, the allegations of the

 

12. Dubois moved for leave to file a third amended complaint
and a reply brief. The district court failed to rule on this
motion until after the court's jurisdiction was terminated by
the docketing of RESTORE's appeal. Dubois asked this court
to clarify the status of this motion in light of the district
court's order granting Dubois' post-judgment motion under
Fed. R. Civ. P. 60(a) for clarification; the court indicated
that it had intended to allow the third amended complaint and
the reply brief, but did not, due to clerical mistakes.
Docket Entry 79-b. We need not decide Dubois' motion because
of our decision on the merits. Resolving the motion would
not, in any event, affect our decision on the standing issue,
because the third amended complaint contains language
identical to the second regarding standing.

-19-

complaint should be construed favorably to the complainant on

a motion to dismiss." Papex Int'l Brokers v. Chase Manhattan 

Bank, 821 F.2d 883, 886 (1st Cir. 1987). Moreover, as noted 

supra, at the pleading stage, "we presum[e] that general 

allegations embrace those specific facts that are necessary

to support the claim." Defenders of Wildlife, 504 U.S. at 

561 (quotation omitted). Further, the record reveals that

the district court had adduced additional information during

its consideration of the standing issue. See AVX, 962 F.2d 

at 114 n.6 (appellate court considering standing issue went

beyond the complaint "in a record-wide search for facts

supporting" the claim of standing). Dubois' local counsel

represented to the court that Dubois continues to return

"regularly," at least annually, to his parents' home in

Lincoln; that he drinks the water from the "Town of Lincoln

water supply that comes down from Loon Pond"; that he "walks

those mountains" in the WMNF. Transcript of Hearing, June

14, 1995, at 7-9. The court expressed its understanding of

Dubois' standing allegations as follows:

Mr. Dubois' injury in fact is he
periodically comes back to the area and
enjoys its natural beauty and will be
injured by not being able to experience
its natural beauty if the project is
allowed to go forward? . . . It's not a
case of someone who's simply saying I'm
an environmentalist and I want to protect
the environment, which everybody
presumably has an interest in doing.
It's somebody who says I'm back there a
lot, I drink the water a lot, I'm up

-20-

there in the woods a lot, and this is
going to hurt me.

Id. at 8, 12. 

We think it useful to compare the facts here with

those alleged in AVX, 962 F.2d at 116-17. In AVX, the 

plaintiff organization had simply made conclusory allegations

that its "members have been and will continue to be harmed by

the releases that [were] the subject of [that] litigation";

its "averment [had] no substance: the members [were]

unidentified; their places of abode [were] not stated; the

extent and frequency of any individual use of the affected

resources [was] left open to surmise." Id. This court in 

AVX pointed to the allegations in SCRAP, 412 U.S. 669, as 

attenuated as they were, in which "there was a geographic

nexus; all the association's members resided in a single,

defined metropolitan area, directly affected by the

challenged action. . . . In SCRAP, unlike [AVX], the claimed 

environmental injury was tied to the particular pursuits of

particular persons." AVX, 962 F.2d at 117. 

The instant case, in contrast with AVX, presents a 

particular person, whose family home is located squarely

within the geographical area allegedly directly affected by

the proposed project, who visits the area regularly, who

drinks the water which will allegedly be tainted by

pollutants, and who will allegedly be deprived of his

environmental, aesthetic and scientific interests in ways

-21-

directly tied to the project he challenges. These are the

types of interests which the Supreme Court has held -- when

asserted by an organization such as RESTORE on behalf of its

members -- satisfy the constitutional requirements for

standing. See SCRAP, 412 U.S. at 685-87; Sierra Club v. 

Morton, 405 U.S. at 734-35 & n.8; see also supra, note 10. 

There is certainly no reason why an organization would have

standing to raise these interests on behalf of its members,

but an individual such as Dubois would not have standing to

raise the same interests on his own behalf.

Thus, with the degree of specificity necessary at

the pleading stage, Dubois has articulated -- directly and by

inference -- how his personal interests will be adversely

affected by the Loon expansion proposal.13 Finally, his

injuries are "likely to be redressed" by the relief he has

requested in the complaint: inter alia, an injunction 

against the project's proceeding. See Defenders of Wildlife, 

504 U.S. at 560-61.

 

13. Our analysis is not altered by the fact that three of
the parties filed cross-motions for summary judgment. The
standing issue was raised only in Loon Corp.'s motion to
dismiss. Where, as here, the defendants have not
contradicted the factual allegations concerning standing that
we deem adequate at the motion to dismiss stage, we will not
subject those allegations to a summary judgment level of
scrutiny in the absence of a motion for summary judgment on
the issue. In these circumstances, "[t]he standing analysis
is no different, as a result of the case having proceeded to
summary judgment, than it would have been at the pleading
stage." Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 
26, 37 n.15 (1976).

-22-

As for the prudential standing requirements, there

is no dispute that the violations and injuries alleged in the

complaint are the sort that NEPA, the CWA, and the Executive

Order were "specifically designed" to protect. See Lujan v. 

National Wildlife Federation, 497 U.S. at 886. Moreover, our 

discussion above related only to Dubois' own legal rights and

interests, not those of third parties. Accordingly, we find

that Dubois has standing to litigate the claims he seeks to

pursue on appeal.

III. STANDARD OF REVIEW III. STANDARD OF REVIEW 

The district court's order granting summary

judgment is subject to de novo review. Borschow Hosp. and 

Medical Supplies v. Cesar Castillo, Inc., 96 F.3d 10, 14 (1st 

Cir. 1996); Lawrence v. Northrop Corp., 980 F.2d 66, 68 (1st 

Cir. 1992). We independently weigh the merits of the summary

judgment motions "without deference to the reasoning of the

district court." Hughes v. Boston Mut. Life Ins. Co., 26 

F.3d 264, 268 (1st Cir. 1994). Accordingly, we must reverse

the court's grant of summary judgment unless "there is no

genuine issue as to any material fact and . . . the moving

party is entitled to a judgment as a matter of law." Fed. R.

Civ. P. 56(c). In analyzing the issues, we will review the

record in the light most favorable to the non-movants, and

make all inferences in their favor. Borschow, 96 F.3d at 14; 

-23-

Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 31 (1st 

Cir. 1990).

It is well established that a reviewing court may

not set aside administrative decisions "simply because the

court is unhappy with the result reached." Baltimore Gas & 

Elec. Co. v. Natural Resources Defense Council, Inc. 

("NRDC"), 462 U.S. 87, 97 (1983) (quoting Vermont Yankee 

Nuclear Power Corp. v. NRDC, 435 U.S. 519, 558 (1978)). The 

fundamental policy questions are "appropriately resolved in

Congress and in the state legislatures"; they "are not 

subject to reexamination in the federal courts under the

guise of judicial review of agency action."14 Vermont 

Yankee, 435 U.S. at 558. Courts may set aside agency 

decisions "only for substantial procedural or substantive

reasons as mandated by statute." Id. 

The applicable statutes here are NEPA and the CWA.

NEPA requires that the agency take a "hard look" at the

environmental consequences of a project before taking a major

action. Baltimore Gas, 462 U.S. at 97 (quoting Kleppe v. 

Sierra Club, 427 U.S. 390, 410 n.21 (1976)). It is the role 

of the courts on judicial review to ensure "that this legal

 

14. For example, in Vermont Yankee, Congress had made the 
policy decision that the nation would try nuclear power; the
Court refused to second-guess that decision in reviewing an
EIS pursuant to NEPA. 435 U.S. at 557-58.

-24-

duty is fulfilled." Foundation on Economic Trends v. 

Heckler, 756 F.2d 143, 151 (D.C. Cir. 1985).  

Congress, in enacting NEPA, meant "to insure a

fully informed and well-considered decision." Vermont 

Yankee, 435 U.S. at 558. But NEPA "does not mandate 

particular results"; it "simply prescribes the necessary

process." Robertson v. Methow Valley Citizens Council, 490 

U.S. 332, 350 (1989). "If the adverse environmental effects

of the proposed action are adequately identified and

evaluated, the agency is not constrained by NEPA from

deciding that other values outweigh the environmental costs."

Id.; see also Baltimore Gas, 462 U.S. at 97. Thus, "[t]he 

role of the courts is simply to ensure that the agency has

adequately considered and disclosed the environmental impact

of its actions and that its decision is not arbitrary or 

capricious." Baltimore Gas, 462 U.S. at 97-98 (emphasis 

added). 

Like NEPA, the CWA does not articulate its own

standard of review; therefore the appropriate scope of review

for both NEPA claims and CWA claims is the standard set forth

in the APA. 5 U.S.C. 706(2)(A) (1994); see Town of Norfolk 

v. U.S. Army Corps of Engineers, 968 F.2d 1438, 1445 (1st 

Cir. 1992); Oregon Natural Resources Council v. U.S. Forest 

Service, 834 F.2d 842, 851-52 (9th Cir. 1987). 

-25-

Under the APA, "[t]he reviewing court shall . . .

hold unlawful and set aside agency action, findings, and

conclusions found to be arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5

U.S.C. 706(2)(A). Errors of law are reviewed by the court

de novo. 5 U.S.C. 706 (1994) ("the reviewing court shall 

decide all relevant questions of law"); Howard v. FAA, 17 

F.3d 1213, 1215 (9th Cir. 1994).

On the other hand, the task of a court reviewing

agency action under the APA's "arbitrary and capricious"

standard, 5 U.S.C. 706(2), is "to determine whether the

[agency] has considered the relevant factors and articulated 

a rational connection between the facts found and the choice 

made." Baltimore Gas, 462 U.S. at 105 (emphasis added) 

(citations omitted); see also Motor Vehicle Mfrs. Ass'n v. 

State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983); 

Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 

U.S. 281, 285-86 (1974); Citizens to Preserve Overton Park, 

Inc. v. Volpe, 401 U.S. 402, 415-17 (1971). If the agency 

decision was based on a consideration of the relevant factors

and there has not been "a clear error of judgment," then the 

agency decision was not arbitrary or capricious. Overton 

Park, 401 U.S. at 416; Marsh v. Oregon Natural Resources 

Council, 490 U.S. 360, 378 (1989).  

-26-

In State Farm, the Supreme Court offered several 

examples of circumstances in which an agency action

"normally" would be considered arbitrary and capricious:

situations where "the agency has relied on factors which

Congress has not intended it to consider, entirely failed to

consider an important aspect of the problem, offered an

explanation for its decision that runs counter to the

evidence before the agency, or is so implausible that it

could not be ascribed to a difference in view or the product

of agency expertise." State Farm, 463 U.S. at 43. These are 

merely "examples," Puerto Rico Sun Oil Co. v. U.S. EPA, 8 

F.3d 73, 77 (1st Cir. 1993); others could be recited as well.

Whether reviewing an EIS or a rulemaking proceeding, the

"reviewing court should not attempt itself to make up for

such deficiencies; we may not supply a reasoned basis for the

agency's action that the agency itself has not given." State 

Farm, 463 U.S. at 43 (citing SEC v. Chenery Corp., 332 U.S. 

194, 196 (1947)).

"While this is a highly deferential standard of

review, it is not a rubber stamp." Citizens Awareness 

Network, Inc. v. U.S. Nuclear Regulatory Comm'n, 59 F.3d 284, 

290 (1st Cir. 1995). Although "the ultimate standard of

review is a narrow one," the court must undertake a

"thorough, probing, in-depth review" and a "searching and

-27-

careful" inquiry into the record.15 Overton Park, 401 U.S. 

at 415-16. In order for an agency decision to pass muster

under the APA's "arbitrary and capricious" test, the

reviewing court must determine that the decision "makes

sense." Puerto Rico Sun Oil, 8 F.3d at 77. Only by 

"carefully reviewing the record and satisfying [itself] that

the agency has made a reasoned decision" can the court

"ensure that agency decisions are founded on a reasoned

evaluation of the relevant factors." Marsh, 490 U.S. at 378 

(internal quotation omitted).

IV. THE NEPA/EIS ISSUE IV. THE NEPA/EIS ISSUE 

The National Environmental Policy Act (NEPA), 42

U.S.C. 4321 et seq., declares a broad national commitment 

to protecting and promoting environmental quality.

Robertson, 490 U.S. at 348; 42 U.S.C. 4331 (1994). The 

primary mechanism for implementing NEPA is the Environmental

Impact Statement (EIS). 42 U.S.C. 4332 (1994). The EIS is

an "action-forcing" procedure, designed "[t]o ensure that

this commitment is infused into the ongoing programs and

actions of the Federal Government." Robertson, 490 U.S. at 

348 (quotation omitted).

 

15. We note that the two-step process articulated in Chevron 
U.S.A. v. NRDC, 467 U.S. 837, 842-43 (1984), does not apply 
here, because we are not reviewing an agency's interpretation
of the statute that it was directed to enforce.

-28-

NEPA requires that an agency considering any action

that would have a significant impact on the environment

prepare an EIS. The EIS must contain a "detailed statement" 

including, inter alia, the environmental impacts of the 

proposed project, and all reasonable alternatives to the

project. 42 U.S.C. 4332(C) (emphasis added). We

previously emphasized the word "detailed" because "it

connotes the careful, reasoned and fully explained analysis

which we think Congress intended." Silva v. Lynn, 482 F.2d 

1282, 1284 n.2 (1st Cir. 1973). Thus, the EIS helps satisfy

NEPA's "twin aims": to ensure that the agency takes a "hard

look" at the environmental consequences of its proposed

action, and to make information on the environmental

consequences available to the public, which may then offer

its insight to assist the agency's decision-making through

the comment process. See Robertson, 490 U.S. at 350, 356; 

Baltimore Gas, 462 U.S. at 97. The EIS thus "helps insure 

the integrity of the process of decision," providing a basis

for comparing the environmental problems raised by the

proposed project with the difficulties involved in the

alternatives. Silva v. Lynn, 482 F.2d at 1285. 

A. Consideration of Environmental Impacts A. Consideration of Environmental Impacts 

In its EIS, the agency must "consider every

significant aspect of the environmental impact of a proposed

action," Baltimore Gas, 462 U.S. at 97 (quoting Vermont 

-29-

Yankee, 435 U.S. at 553), and "evaluate different courses of 

action," Kleppe, 427 U.S. at 410. The EIS's discussion of 

environmental impacts "forms the scientific and analytic

basis for the comparisons" of alternatives, 40 C.F.R. 

1502.16 (1995), which are "the heart" of the EIS, id. at  

1502.14; see Part IV(B), infra. The discussion of impacts 

must include both "direct and indirect effects (secondary

impacts) of a proposed project." Sierra Club v. Marsh, 976 

F.2d 763, 767 (1st Cir. 1992); 40 C.F.R. 1502.16(b). The

agency need not speculate about all conceivable impacts, but

it must evaluate the reasonably foreseeable significant

effects of the proposed action. Sierra Club v. Marsh, 976 

F.2d at 767. In this context, reasonable foreseeability

means that "the impact is sufficiently likely to occur that a

person of ordinary prudence would take it into account in

reaching a decision." Id. An environmental effect would be 

considered "too speculative" for inclusion in the EIS if it

cannot be described at the time the EIS is drafted with

sufficient specificity to make its consideration useful to a

reasonable decision-maker. Id. at 768. Nevertheless, 

"[r]easonable forecasting . . . is . . . implicit in NEPA,

and we must reject any attempt by agencies to shirk their

responsibilities under NEPA by labeling any and all

discussion of future environmental effects as 'crystal ball

-30-

inquiry.'" Scientists' Inst. for Pub. Info. v. Atomic Energy 

Comm'n, 481 F.2d 1079, 1092 (D.C. Cir. 1973). 

Plaintiffs contended in the district court that the

Forest Service failed to adequately assess the impact of Loon

Corp.'s planned expansion on Loon Pond. Plaintiffs listed a

number of specific areas of concern. The district court

found the Forest Service's consideration of environmental

impacts to be adequate, and plaintiffs have not appealed this

point. Accordingly, we need not pursue this issue here. 

B. Consideration of Alternatives B. Consideration of Alternatives 

"[O]ne important ingredient of an EIS is the

discussion of steps that can be taken to mitigate adverse

environmental consequences" of a proposed action. Robertson, 

490 U.S. at 351. As one aspect of evaluating a proposed

course of action under NEPA, the agency has a duty "to study

all alternatives that appear reasonable and appropriate for

study . . . , as well as significant alternatives suggested

by other agencies or the public during the comment period."

Roosevelt Campobello Int'l Park Comm'n v. United States EPA, 

684 F.2d 1041, 1047 (1st Cir. 1982) (quotations omitted);

Valley Citizens for a Safe Env't v. Aldridge, 886 F.2d 458, 

462 (1st Cir. 1989); City of Carmel-By-The-Sea v. U.S. Dept. 

of Transp., 95 F.3d 892, 903 (9th Cir. 1996). 

As stated in the Council on Environmental Quality

("CEQ") regulations implementing NEPA, the consideration of

-31-

alternatives is "the heart of the environmental impact

statement." 40 C.F.R. 1502.14. These implementing

regulations are entitled to substantial deference.

Robertson, 490 U.S. at 355 (citing Andrus v. Sierra Club, 442 

U.S. 347, 358 (1979)). The regulations require that the EIS

"[r]igorously explore and objectively evaluate all reasonable

alternatives, and for alternatives which were eliminated from

detailed study, briefly discuss the reasons for their having

been eliminated." 40 C.F.R. 1502.14(a). It is "absolutely

essential to the NEPA process that the decisionmaker be

provided with a detailed and careful analysis of the relative

environmental merits and demerits of the proposed action and

possible alternatives, a requirement that we have

characterized as 'the linchpin of the entire impact

statement.'" NRDC v. Callaway, 524 F.2d 79, 92 (2d Cir. 

1975) (citation omitted); see Silva v. Lynn, 482 F.2d at 

1285; All Indian Pueblo Council v. United States, 975 F.2d 

1437, 1444 (10th Cir. 1992) (holding that a thorough

discussion of the alternatives is "imperative"). "The

'existence of a viable but unexamined alternative renders an

environmental impact statement inadequate.'" Resources Ltd. 

v. Robertson, 35 F.3d 1300, 1307 (9th Cir. 1993) (quoting 

Idaho Conservation League v. Mumma, 956 F.2d 1508, 1519 (9th 

Cir. 1992)); see Grazing Fields Farm v. Goldschmidt, 626 F.2d 

1068, 1072 (1st Cir. 1980) (Even the existence of supportive

-32-

studies and memoranda contained in the administrative record

but not incorporated in the EIS cannot "bring into compliance

with NEPA an EIS that by itself is inadequate."). Because of

the importance of NEPA's procedural and informational

aspects, if the agency fails to properly circulate the

required issues for review by interested parties, then the

EIS is insufficient even if the agency's actual decision was

informed and well-reasoned. Grazing Fields Farm, 626 F.2d at 

1072; see Massachusetts v. Watt, 716 F.2d 946, 951 (1st Cir. 

1983).

C. The Requisite Level of Detail C. The Requisite Level of Detail 

One purpose of the EIS requirement is to "provide

decisionmakers with sufficiently detailed information to aid

in determining whether to proceed with the action in light of

its environmental consequences." Northwest Resource Info. 

Ctr., Inc. v. National Marine Fisheries Serv., 56 F.3d 1060, 

1064 (9th Cir. 1995). What level of detail is sufficient

depends on the nature and scope of the proposed action.

Valley Citizens, 886 F.2d at 463; Mumma, 956 F.2d at 1520. 

The discussion of environmental effects of alternatives need

not be exhaustive. "[W]hat is required is information

sufficient to permit a reasoned choice of alternatives as far

as environmental aspects are concerned," All Indian Pueblo 

Council, 975 F.2d at 1444 (quoting NRDC v. Morton, 458 F.2d 

827, 836 (D.C. Cir. 1972)); see also Carmel-By-The-Sea, 95 

-33-

F.3d at 903, information sufficient for the agency to

"[r]igorously explore and objectively evaluate" all

reasonable alternatives. 40 C.F.R. 1502.14(a); All Indian 

Pueblo Council, 975 F.2d at 1444. 

The courts have applied "a rule of reason in

determining whether an EIS contains a reasonably thorough

discussion of the significant aspects of the probable

environmental consequences." Carmel-By-The-Sea, 95 F.3d at 

899 (quotation omitted); see also Grazing Fields Farm, 626 

F.2d at 1074; Massachusetts v. Andrus, 594 F.2d 872, 884 (1st 

Cir. 1979); cf. Marsh, 490 U.S. at 373 (supplemental EIS). 

One aspect of this determination is whether the agency has

gone "beyond mere assertions and indicate[d] its basis for

them." Silva v. Lynn, 482 F.2d at 1287. The agency "must 

'explicate fully its course of inquiry, its analysis and its

reasoning.'" Massachusetts v. Andrus, 594 F.2d at 883 

(quoting Silva v. Lynn, 482 F.2d at 1284-85). The court must 

determine whether, in the context of the record, the agency's

decision -- and the analysis on which it is based -- is too

unreasonable for the law to permit it to stand. See Sierra 

Club v. Marsh, 976 F.2d at 769. We apply a rule of reason 

because courts should not "fly speck" an EIS and hold it

insufficient based on inconsequential or technical

deficiencies. Swanson v. U.S. Forest Service, 87 F.3d 339, 

343 (9th Cir. 1996). "The statute must be construed in the

-34-

light of reason if it is not to demand what is, fairly

speaking, not meaningfully possible. . . . But implicit in

this rule of reason is the overriding statutory duty of

compliance with impact statement procedures to the fullest

extent possible." Scientists' Inst., 481 F.2d at 1092 

(quotations omitted). The agency must "squarely turn[]" all

"procedural corners" in its EIS. Citizens Awareness Network, 

59 F.3d at 290 (quoting Adams, 38 F.3d at 49). The question 

whether a particular deficiency or combination is sufficient

to warrant holding it legally inadequate, or constitutes

merely a "fly speck," is essentially a legal question,

reviewable de novo. Oregon Environmental Council v. Kunzman, 

817 F.2d 484, 493 (9th Cir. 1987). 

Applying these standards to the instant case, we

conclude that the Forest Service has not rigorously explored

all reasonable alternatives, in particular the alternative

that Loon Corp. be required to build artificial water storage

ponds, instead of withdrawing water for snowmaking from, and

discharging water into, an "outstanding resource water" like

Loon Pond. The adverse environmental impacts of using Loon

Pond were before the agency, and more than one commenter

proposed building artificial water storage ponds, a proposal

that would, on its face, avoid some of those adverse impacts.

One such commenter, Paul Beaudin of the Lincoln Committee of

Concerned Citizens (LCCC), enclosed clippings pointing up

-35-

"the wisdom of [Loon Corp.'s] need to enact the LCCC's 

proposal for water containment pond[s] high up on the Boyle

Brook." JA, vol. II, Response to Public Comment on RDEIS at

A-12. The LCCC proposal itself, made two months earlier,

referred to a letter from the National Ecology Research

Center recommending consideration of water storage

alternatives other than Loon Pond, and enclosed a map

indicating where up to three containment ponds could be

installed. LCCC listed some nine advantages, including the

cost-saving factor of servicing two-thirds to three-fourths

of Loon Corp.'s snowmaking system by gravity feed.16

Instead of "rigorously explor[ing]" the alternative

of using artificial water storage units instead of Loon Pond,

the Forest Service's Final EIS did not respond to these

comments at all. The agency did not in any way explain its

reasoning or provide a factual basis for its refusal to

consider, in general, the possibility of alternatives to

using Loon Pond for snowmaking, or LCCC's reasonably

 

16. In addition to the Beaudin/LCCC proposal, plaintiff
Dubois' comments also suggested that Loon Corp. build
artificial water storage units, in his case underground. 
This suggestion, requiring costly subterranean construction,
may be more facially vulnerable than Beaudin/LCCC's; it may
or may not alone have required an explicit response, however
brief. But we need not address this question because we
reverse based on the Beaudin/LCCC proposal.

-36-

thoughtful proposal in particular.17 This failure violated

the Forest Service's EIS obligation under NEPA. See 40 

C.F.R. 1502.9(b) (1995); 42 U.S.C. 4332(C)(iii) (1994).

The use of artificial storage ponds is not so

facially implausible that it can be dismissed out of hand.

The Forest Service, on another occasion, required the

Sugarbush Ski Area in Vermont to construct, for its

snowmaking operations, three artificial water storage ponds

capable of holding 123.5 million gallons of water on 22.9

acres of private land. JA, vol. I, at 457, 465. This is 73%

more than the 71 million gallons of water that the ROD

estimates would be withdrawn from Loon Pond under the

approved Loon Mountain expansion project. Beaudin/LCCC

proposed constructing three similar ponds in the Boyle Brook

area high up Loon Mountain. In addition, the record contains

evidence that Loon Corp. owns 365 acres of private land at

the base of the ski area, where similar storage ponds could

be constructed, and that such ponds could be filled with

water from the East Branch, which is typically high enough in

the spring to contribute to flooding in downstream areas.

 

17. Aside from its preservation argument, see Part IV(D), 
infra, the Forest Service merely argues that the LCCC 
proposal was made to Loon Corp. before the RDEIS was
published. However, the Forest Service does not suggest that
Beaudin's comment letter -- responding to the Forest
Service's RDEIS -- did not fairly refer to the prior LCCC
proposal, or that this proposal was unknown to the Service.

-37-

Our conclusion is buttressed by NEPA's requirement

that an agency consider and an EIS discuss "steps that can be

taken to mitigate the adverse environmental consequences" of

a proposed project. See Robertson, 490 U.S. at 351. Even 

though there is no requirement that the agency reach a

particular substantive result, such as actually formulating

and adopting a complete mitigation plan, the agency must

discuss "the extent to which adverse effects can be avoided,"

i.e., by mitigation measures, "in sufficient detail to ensure 

that environmental consequences have been fairly evaluated."

Id. at 352. This duty -- coupled with the comments alerting 

the agency to the environmental consequences of using Loon

Pond for snowmaking and suggesting the containment pond

solution -- required the Forest Service to seriously consider

this alternative and to explain its reasoning if it rejected

the proposal.

Nor can the Forest Service claim that its failure

to consider an alternative to using Loon Pond for snowmaking

was a de minimis or "fly speck" issue. The record indicates 

serious adverse consequences to Loon Pond if it is used "as a

cistern," to use EPA's words, and at least a reasonable

probability that the use of artificial storage ponds could

avoid those consequences. The existence of this non-de 

minimis "viable but unexamined alternative renders [the Loon 

EIS] inadequate." See Resources, Inc., 35 F.3d at 1307. 

-38-

After the matter had proceeded to court, counsel

for the Forest Service argued that constructing artificial

storage ponds large enough to serve as an alternative to

using Loon Pond would not be a viable alternative for reasons

that were conclusorily stated. The district court accepted

this argument. But this "post hoc rationalization of 

counsel" cannot overcome the agency's failure to consider and

address in its FEIS the alternative proposed by commenters.

State Farm, 463 U.S. at 50; see Burlington Truck Lines, Inc. 

v. United States, 371 U.S. 156, 168 (1962); NRDC v. U.S. EPA, 

824 F.2d 1258, 1286 n.19 (1st Cir. 1987). Such post hoc 

rationalizations are inherently suspect, and in any event are

no substitute for the agency's following statutorily mandated

procedures. As noted supra, even if the agency's actual 

decision was a reasoned one, the EIS is insufficient if it

does not properly discuss the required issues. Grazing 

Fields Farm, 626 F.2d at 1072. 

In sum, how "probing" an investigation NEPA

requires of alternatives depends on the circumstances,

including the nature of the action at issue. Valley 

Citizens, 886 F.2d at 463. Thus, the reviewing court must be 

flexible in evaluating the depth of analysis to require in an

EIS, because, while NEPA "does not mandate particular

results," it does require that the agency have adequately

identified and evaluated a project's environmental

-39-

consequences. Robertson, 490 U.S. at 350. "NEPA's success 

in large part arises from the use of legal concepts [that are

flexible] such as 'reasonableness' and 'adequacy' that permit

courts to adapt it successfully to so many different kinds of

circumstances surrounding so many different kinds of

governmental decisions." Valley Citizens, 886 F.2d at 463. 

Although in Valley Citizens we found the agency's 

analysis of alternatives "brief but adequate," 886 F.2d at

462, the contrast with the instant case is instructive. In

Valley Citizens, we found that nothing in the record or in 

comments on the draft "point[ed] out any inaccuracy" in the

agency's cost "descriptions" or in its "discussions" of other

non-environmental considerations. Id. In contrast, in the 

instant case, the final EIS contains no "description" or 

"discussion" whatsoever as to why an alternative source of

water such as an artificially created storage pond would be

impractical. The agency has discretion to balance competing

concerns and to choose among alternatives, but it must

legitimately assess the relative merits of reasonable

alternatives before making its decision. 

After a searching and careful review of the record

in the instant case, we are not convinced that the Forest

Service's decision was founded on a reasoned evaluation of

the relevant factors, Marsh, 490 U.S. at 378, or that it 

articulated a rational connection between the facts found and

-40-

the choice made, Baltimore Gas, 462 U.S. at 105. Hence, it 

acted arbitrarily and capriciously in granting Loon Corp.'s

special use permit for the expanded ski resort. Moreover,

because the Forest Service did not satisfy the requirement

that it "rigorously explore and objectively evaluate" all

reasonable alternatives,18 40 C.F.R. 1502.14(a), its

decision was not in accordance with law.19 See 5 U.S.C.  

706(2)(A).

D. The Preservation Issue D. The Preservation Issue 

The Forest Service argues that plaintiffs have not

preserved their argument that the agency should have more

seriously considered, as an alternative to Loon Pond, some

other source for water and some other location to discharge

 

18. In addition to the question of an alternative to Loon
Pond as a source of water or as a discharge point, plaintiff
RESTORE has raised a second issue regarding alternatives.
RESTORE asserts that the Forest Service should have
considered alternative sites for the entire project, outside
of the White Mountain National Forest. The district court
found that such alternative sites were not appropriate for
study because some draw from different markets and others do
not offer the same type of skiing experience as the WMNF ski
areas which have more terrain, higher mountains, more natural
snow, and better facilities than their counterparts outside
the WMNF. We agree.

19. Dubois also notes that the FEIS failed to disclose what
he claims are numerous violations of state water quality
standards, which "renders the FEIS unacceptable under NEPA."
Dubois Brief at 16 n.11; see Northwest Indian Cemetery 
Protective Ass'n v. Peterson, 764 F.2d 581, 587-88 (9th Cir. 
1985), rev'd on other grounds sub nom. Lyng v. Northwest 
Indian Cemetery Protective Ass'n, 485 U.S. 439 (1988). For 
discussion of the issue of state water quality standards, see 
Part VII(C), infra. 

-41-

the effluent from Loon Corp.'s snowmaking pipes. It contends

that plaintiffs failed adequately to raise their contentions

during the public comment period, so they waived their right

to pursue these challenges on their merits. The Forest

Service argues that, "[i]f commenters could require agencies

to undertake detailed comparative analyses merely by

asserting the superiority of an alternative site,

configuration or method, only the imaginations of project

opponents would limit the length of EISs and the duration of

the NEPA process." Forest Service Brief at 53. Raising the

specter of catastrophe only obfuscates the real issues here:

whether the Forest Service adequately considered alternatives

to using Loon Pond as a vehicle for Loon Corp.'s snowmaking,

with adequacy based on the reasonableness and practicality of

the alternatives, and whether the Forest Service adequately

explained in its FEIS why it decided against such

alternatives.

The Forest Service relies on Roosevelt Campobello: 

"In order to preserve an alternatives issue for review, it is

not enough simply to make a facially plausible suggestion;

rather, an intervenor must offer tangible evidence that an 

alternative site might offer a substantial measure of 

superiority as a site." 684 F.2d at 1047 (emphasis added)

(quotation omitted). The Forest Service's reliance on

Roosevelt Campobello is misplaced. That case, and the 

-42-

precedents it relied on, dealt with a claim that the agency

had not considered all appropriate alternative sites on which 

to locate a particular project. Obviously, the number of

potential locations for any project is infinite, and an

agency cannot be expected to consider seriously every

possible location before approving a project. In such a

context, the agency is only required to consider "all

alternatives which were feasible and reasonably apparent at

the time of drafting the EIS." Id.; see also Seacoast Anti- 

Pollution League v. Nuclear Regulatory Comm'n, 598 F.2d 1221, 

1229 (1st Cir. 1979) (Agency need not "ferret out every

possible alternative, regardless of how uncommon or

unknown.") (quoting Vermont Yankee, 435 U.S. at 551).  

The situation in the instant case is wholly

different. It is one thing to ask whether there are "known,"

"feasible," alternative sites on which to locate a project, 

and a different matter to ask whether the Forest Service in

the instant case should have considered an alternative means 

of implementing the expansion of the Loon Mountain Ski Area -

- a particular means of operation that would do less

environmental damage -- without changing the site to another

state or another mountain. Here, the Forest Service was

alerted by commenters to the alternative of using artificial

storage ponds instead of Loon Pond for snowmaking; but even

without such comments, it should have been "reasonably

-43-

apparent" to the Forest Service, Roosevelt Campobello, 684 

F.2d at 1047, not "unknown," Seacoast Anti-Pollution League, 

598 F.2d at 1229, that such an alternative existed.

In the instant case, at least two commenters, Paul

Beaudin of LCCC and plaintiff Dubois, provided notice to the

Forest Service, informing it of the substance of their

proposed alternative. Though not detailed, these comments

submitted in response to the Forest Service's RDEIS made

clear that the commenters thought the agency should consider

some alternative source of water other than Loon Pond and

some alternative place to discharge the water after it had

gone through the snowmaking pipes. They argued that such an

alternative would reduce the negative environmental impact on

Loon Pond from depleting the pond's water and from refilling

the pond with polluted water either from the East Branch or

from acidic snowmelt. Dubois explicitly and Beaudin by

reference suggested the possibility of new man-made storage

units to accomplish these goals. These comments provided

sufficient notice to "alert[] the agency" to the alternative

being proposed and the environmental concern the alternative

-44-

might address.20 See Seacoast Anti-Pollution League, 598 

F.2d at 1229 (quoting Vermont Yankee, 435 U.S. at 553).  

Because the comments to the EIS were sufficient to

notify the agency of the potential alternatives, see Adams v. 

U.S. EPA, 38 F.3d 43, 52 (1st Cir. 1994), the district court 

erred in concluding that plaintiffs were required to "offer[]

specifics as to how to implement a suggested alternative

water storage system." Memorandum and Order at 31. Such

"specifics" are not required. As we reasoned in Adams, the 

purpose of public participation regulations is simply "to

provide notice" to the agency, not to "present technical or

precise scientific or legal challenges to specific

provisions" of the document in question. Adams, 38 F.3d at 

52. "It would be inconsistent with the general purpose of

public participation regulations to construe the regulations

strictly." Id.  

Moreover, NEPA requires the agency to try on its

own to develop alternatives that will "mitigate the adverse

environmental consequences" of a proposed project.

 

20. In Adams v. U.S. EPA, 38 F.3d 43 (1st Cir. 1994), we 
held that a plaintiff had sufficiently raised his proposal at
the agency level by stating in his comment: "The EPA has not
carried out the intent of Congress in relation to the [Act in
question, citing specific statutory provisions]." Adams, 38 
F.3d at 52. This court held that that reference -- together
with other comments discussing the detrimental impact of the
proposed project on beaches and marine life -- was sufficient
to "alert[] the EPA to [his] concern that the EPA had not
adequately complied with the [statutory] mandates." Id.  

-45-

Robertson, 490 U.S. at 351. "In respect to alternatives, an 

agency must on its own initiative study all alternatives that 

appear reasonable and appropriate for study at the time, and

must also look into other significant alternatives that are

called to its attention by other agencies, or by the public

during the comment period afforded for that purpose."

Seacoast Anti-Pollution League, 598 F.2d at 1230 (emphasis 

added).21 Particularly given this directive, the alert

furnished by Beaudin and Dubois required exploration and

discussion by the Forest Service of the idea that

environmental damage might be reduced by the use of

artificial storage ponds instead of Loon Pond for snowmaking

purposes. Therefore, the district court should have rejected

the Forest Service's argument that Dubois failed to

adequately preserve the issue of alternatives.

V. SUPPLEMENTAL EIS V. SUPPLEMENTAL EIS 

Plaintiffs also appeal the district court's

conclusion that the Forest Service was not required, under

NEPA, to prepare a supplemental EIS. The question of a

supplemental EIS is premised on the dual purposes of the EIS:

 

21. In deciding whether an agency has adequately studied all
reasonable alternatives, a reviewing court may consider "the
extent and sincerity of the opponents' participation."
Seacoast Anti-Pollution League, 598 F.2d at 1231. Here, it 
is apparent from the record that Dubois has treated this
matter seriously, not as "a game," id. at 1229; he has not 
"played dog in the manger with respect to alerting the
agency" to his views regarding alternatives, id., in an 
effort to "scuttle" the project, id. at 1231. 

-46-

to assure that the public who might be affected by the

proposed project be fully informed of the proposal, its

impacts and all major points of view; and to give the agency

the benefit of informed comments and suggestions as it takes

a "hard look" at the consequences of proposed actions. See 

Robertson, 490 U.S. at 349, 356; 40 C.F.R. 1502.1, 

1502.9(a) (1995). 

An agency "shall" prepare a supplemental EIS if,

after issuing its latest draft EIS, "[t]he agency makes

substantial changes in the proposed action that are relevant

to environmental concerns." 40 C.F.R. 1502.9(c)(1)(i)

(1995). The use of the word "shall" is mandatory, not

precatory. It creates a duty on the part of the agency to

prepare a supplemental EIS if substantial changes from any of

the proposed alternatives are made and the changes are

relevant to environmental concerns. See Marsh, 490 U.S. at 

372. Thus, as explained by CEQ, an additional alternative

that has not been disseminated previously in a draft EIS may

be adopted in a final EIS, without further public comment,

only if it is "qualitatively within the spectrum of

alternatives that were discussed" in the prior draft;

otherwise a supplemental draft is needed. See Forty Most 

Asked Questions Concerning CEQ's NEPA Regulations, 46 Fed.

Reg. 18026, # 29b (1981). 

-47-

Plaintiffs argue that the project proposed as

Alternative 6, appearing for the first time in the Final EIS,

embodies "substantial changes" from any of the alternatives

proposed in the prior drafts of the EIS, and that those

changes are "relevant to environmental concerns." See 40 

C.F.R. 1502.9(c)(1)(i). Therefore, plaintiffs assert that,

by not describing Alternative 6 in a supplemental EIS --

which would give the public an opportunity to comment on it

and give the Forest Service the benefit of those comments in

its consideration of the environmental impact of Alternative

6 -- the Forest Service collided with both the public

information and the agency guidance objectives of NEPA. In

response, defendants argue that plaintiffs' interpretation of

the previously discussed alternatives is incorrect, because

Alternative 6 is merely a scaled-down modification of

Alternative 2 which, as proposed in two phases in the RDEIS,

would have been far larger and far more intrusive on the

environment than the new preferred Alternative 6. Plaintiffs

reply that only Phase I and not Phase II of Alternative 2 was

seriously considered and analyzed prior to the development of

Alternative 6 in the final EIS.22 Defendants deny this

assertion.

 

22. Plaintiffs point to several instances where the FEIS
stated that further environmental analysis would be conducted
in the future if and when Loon Corp. sought permission to
proceed with Phase II.

-48-

We conclude, based on the record in this case, that

a supplemental EIS was required. The scope of review of a

reviewing court is the APA's "arbitrary and capricious"

standard. Marsh, 490 U.S. at 375-76; see Part III, supra. 

The Court in Marsh was especially deferential to the 

"informed discretion of the responsible federal agencies,"

due to the "high level of technical expertise" required in

that case to analyze the relevant documents regarding soil

composition and a dam's impact on downstream turbidity.

Marsh, 490 U.S. at 377, 379. In the instant case, however, 

nothing in the FEIS indicates that any such technically

complex scientific analysis would be required in order for

this court to determine that Alternative 6 involves a

"substantial change" from the prior proposals at Loon

Mountain.

Alternative 6, adopted by the Forest Service as its

preferred alternative in the final EIS, does not fall "within

the spectrum of alternatives" that were considered in

previous drafts, even if Phase II of Alternative 2 had been

adequately analyzed prior to the FEIS. Alternative 6 entails

a different configuration of activities and locations, not

merely a reduced version of a previously-considered

alternative. Phase II of Alternative 2 proposed expanding

the ski area primarily on land that is not within the current

permit area; in contrast, Alternative 6 squeezes much of its

-49-

expansion into that current permit area. To accomplish this,

Alternative 6 widens existing trails so as to eliminate

buffers that currently separate the trails. It also

envisions a 28,500-square-foot base lodge facility within the

existing permit area. And it develops ski trails, access

roads and lifts on land that the prior alternatives had left

as a woodland buffer between the old ski area and the

proposed expansion area. These are substantial changes from

the previously-discussed alternatives, not mere modifications

"within the spectrum" of those prior alternatives. It would

be one thing if the Forest Service had adopted a new

alternative that was actually within the range of previously

considered alternatives, e.g., simply reducing the scale of 

every relevant particular. It is quite another thing to

adopt a proposal that is configured differently, in which

case public commenters might have pointed out, if given the

opportunity -- and the Forest Service might have seriously

considered -- wholly new problems posed by the new

configuration (even if some of the environmental problems

present in the prior alternatives have been eliminated).

Nor can it be said that these changes are not

"relevant to environmental concerns." They could very well

have environmental impacts that the Forest Service has not

yet considered, simply based on their more compact physical

location. Indeed, the RDEIS said the Forest Service had

-50-

considered expansion alternatives such as "other

configurations on the existing permit area," but these

alternatives "were eliminated from detailed analysis because

they were not reasonable or feasible alternatives." JA, vol.

I, at 145-46. Moreover, the plan selected, Alternative 6 in

the FEIS, would require that four million gallons more water

be withdrawn annually for snowmaking, compared with the

closest alternative among the five previously given detailed

consideration. Whether or not viewed in the graphic terms

described by plaintiff RESTORE -- four million gallons

annually is enough water "to create a lake the size of a

football field more than eleven feet deep," RESTORE Brief at

33 -- this change can be expected to have a significant

enough effect on the environment that additional analysis

through a supplemental EIS would be required. Cf. Roosevelt 

Campobello, 684 F.2d at 1055 (requiring a supplemental EIS to 

consider newly completed studies regarding the small risk of

a major oil spill). We conclude, based on the record in this

case, that Alternative 6 entails substantial changes from the

previously proposed actions that are relevant to

environmental concerns, and that the Forest Service did not

present those changes to the public in its FEIS for review

and comment. Accordingly, the Forest Service's failure to

prepare a supplemental EIS was arbitrary and capricious. 

VI. EXECUTIVE ORDER 11,990  VI. EXECUTIVE ORDER 11,990  

-51-

Plaintiffs contend that the Forest Service's

failure to adequately consider alternatives to the use of

Loon Pond and failure to develop adequate mitigation measures

violates Executive Order 11,990, as well as NEPA. The

district court rejected this argument on essentially the same

grounds as the NEPA argument. 

On appeal, the government contends that the

Executive Order is not enforceable, at least by private

parties, because NEPA did not confer rulemaking authority on

the President. Plaintiffs argue that the Executive Order is

accorded the full force and effect of a statute or

regulation, enforceable under the APA. We have not

previously decided this precise issue, nor need we decide it

now.

Even assuming that the Executive Order is

enforceable under the APA, it does not apply to the

circumstances of this case. The Executive Order states that

federal agencies,

to the extent permitted by law, shall
avoid undertaking or providing assistance
for new construction located in wetlands
unless the head of the agency finds (1)
that there is no practicable alternative
to such construction, and (2) that the
proposed action includes all practicable
measures to minimize harm to wetlands
which may result from such use.

Exec. Order No. 11,990, 2. There is no dispute that Loon

Pond is a "wetland." The Forest Service, however, contends

-52-

that the Loon Corp. expansion plan does not constitute "new

construction." The Executive Order defines "new

construction" to include "draining, dredging, channelizing,

filling, diking, impounding, and related activities." Id.,  

7(b). Dubois claims that the use of Loon Pond as a source of

water for snowmaking and the discharge of used water from the

snowmaking pipes into Loon Pond constitute "draining" and

"filling" within the meaning of 7(b).

We agree with the Forest Service that the mere

expansion of a previously ongoing withdrawal of water from or

addition of water to a reservoir ordinarily does not fall

within the ambit of the Executive Order's "new construction"

requirement.23 This conclusion is dictated by the plain

meaning of the phrase "new construction," which does not

ordinarily encompass the mere expansion of an ongoing

activity, unless that activity itself constituted "new

construction." Likewise, in common usage, the words

"draining" and "filling" generally refer to activities that

eliminate a wetland to convert it to another use, not to the

expansion of an activity that already adds water to or

 

23. It is conceivable, of course, that an expansion of an
already existing activity could fall within the ambit of the 
Executive Order's "new construction" requirement. This could
occur if the expansion effectuated a qualitative change in
the nature of the activity, rather than a mere quantitative
enlargement of that activity. On the record before us in the
instant case, we cannot say that plaintiffs have demonstrated
such a qualitative change.

-53-

withdraws water from an existing pond. Our reading is

buttressed by common sense: one would not ordinarily think,

without more, that a federal agency operating a dam on

federal land would be required, by the Executive Order, to

issue notices and make findings every time water is added to

or withdrawn from the dam (assuming that the dam has already

met all legal requirements to begin operation).

Applying the foregoing analysis of the Executive

Order to the record in the instant case, we conclude that the

situation here is more akin to an expansion of ongoing

activities than to "new construction." The town of Lincoln

is already using Loon Pond as a source of town water. And

Loon Corp. has been using the Pond as a source of water for

snowmaking, to a depth of four to six feet on the average.

It is true that the extent of this intrusion is less than

would be the case under the proposed expansion. But

plaintiffs did not challenge these currently-existing

intrusions, and they have not demonstrated a factual basis

for their conclusion that there is something qualitatively

"new" about the proposed drawdown. Thus, the proposed Loon

Corp. expansion project -- by drawing down a substantial

additional amount of water from Loon Pond and refilling it

with East Branch water or with acidic runoff -- does not

satisfy the definition of "new construction" within the

meaning of Executive Order 11,990, even though it constitutes

-54-

a major action with significant impact on the environment,

triggering NEPA's EIS requirements.

VII. THE CLEAN WATER ACT ISSUES VII. THE CLEAN WATER ACT ISSUES 

The Clean Water Act (CWA) was "a bold and sweeping

legislative initiative," United States v. Commonwealth of 

P.R., 721 F.2d 832, 834 (1st Cir. 1983), enacted to "restore 

and maintain the chemical, physical, and biological integrity

of the Nation's waters." 33 U.S.C. 1251(a) (1994). "This

objective incorporated a broad, systemic view of the goal of

maintaining and improving water quality: as the House Report

on the legislation put it, 'the word "integrity" . . . refers

to a condition in which the natural structure and function of

ecosystems [are] maintained.'" United States v. Riverside 

Bayview Homes, Inc., 474 U.S. 121, 132 (1985) (quoting H.R. 

Rep. No. 92-911, at 76 (1972)). In contrast to NEPA's focus

on process, the CWA is substantive, focusing upon the

"integrity of the Nation's Waters, not the permit process."

Massachusetts v. Watt, 716 F.2d at 952 (quoting Weinberger v. 

Romero-Barcelo, 456 U.S. at 314).  

The most important component of the Act is the

requirement that an NPDES permit be obtained, Commonwealth of 

P.R., 721 F.2d at 834; see 33 U.S.C. 1342 (1994), which we 

discuss in Part VII(B), infra. In addition, the CWA requires 

states to adopt water quality standards which protect against

degradation of the physical, chemical, or biological

-55-

attributes of the state's waters. 33 U.S.C. 1251(a),

1313(d)(4)(B) (1994); 40 C.F.R. 131.12 (1995). This is

discussed in Part VII(C), infra.24 Before turning to the 

merits of these issues, however, we must first address the

defendants' jurisdictional arguments.

A. Jurisdictional Issues A. Jurisdictional Issues 

As a threshold matter, defendants argue that we

need not address the merits of plaintiffs' claim that an

NPDES permit was required, because the court lacks subject

matter jurisdiction. Defendants argue that the NPDES permit

issue is not properly raised because plaintiffs failed to

provide notice of their intentions to sue Loon Corp.25

Defendants contend that Section 505(b) of the CWA "prohibits

citizen plaintiffs from filing [suit to enforce the CWA's

NPDES permit requirement] until at least 60 days after they

have provided notice of their intent to sue" to EPA, to the

State in which the alleged violation occurred, and to "any

 

24. The third major aspect of the CWA is the use of
industry-specific effluent standards to control the quality
of effluent that can be attained using available pollution
control technology. 33 U.S.C. 1311, et seq. This aspect 
of the CWA is not in issue in this litigation.

25. The Forest Service also asserts that no claim can stand
against it as a defendant because EPA regulations place the
responsibility for obtaining an NPDES permit on the
"operator" of a covered activity; the Forest Service is
merely the owner of the land on which the activity takes
place. This argument is unavailing: if an NPDES permit were
required, as plaintiffs contend, then the Forest Service
should not have granted a special use permit to Loon Corp.
until the NPDES permit had been obtained.

-56-

alleged violator" of the standard, limitation, or order.

Forest Service Brief at 37; see 33 U.S.C. 1365 (b)(1) 

(1994). It is undisputed, however, that Dubois, the original

plaintiff, did provide notice to the Forest Service of his

intent to sue. The Forest Service was the only defendant

that he did sue; and he alleged only that the Forest Service,

not Loon Corp., had violated federal statutes, including the

CWA, in approving Loon Corp.'s expansion plan. The district

court therefore had jurisdiction to hear Dubois' claim that

the Forest Service had approved the project illegally by not

ensuring that an NPDES permit was obtained. His properly

raised NEPA claim subsumed the CWA claim.26

Thus, even if Loon Corp.'s lack of notice did

deprive us of jurisdiction to hear Dubois' claim that the

Forest Service violated the CWA by failing to require an

NPDES permit before approving the special use permit, this

 

26. Thereafter, Loon Corp. chose to intervene in the action
in order to protect its business interests. When Loon Corp.
voluntarily intervened in an ongoing action, it "step[ped]
into the shoes" of the original defendants -- who were
properly before the court -- insofar as the 60-day notice is
concerned. Kitlutsisti v. ARCO Alaska, Inc., 592 F. Supp. 
832, 842 (D. Alaska 1984), vacated as moot, 782 F.2d 800 (9th 
Cir. 1986); cf. E.H. Ashley & Co. v. Wells Fargo Alarm 
Servs., 907 F.2d 1274, 1277 (1st Cir. 1990) (When insurer, as 
subrogee, steps into shoes of insured, insurer "has no
greater rights against a third party" than the insured had;
insurer "was on constructive notice of the provisions of
[insured's] contract [with third party] because it occupies
the shoes of its insured.").

-57-

would not remove the NPDES permit issue from the case.27

Regardless of whether any of the remedies provided in the CWA

would be available to Dubois in light of his asserted failure

to provide proper notice of his intent to sue, this court

would still have the authority and the obligation to decide,

under NEPA, whether an NPDES permit is required in this case.

See Keating v. FERC, 927 F.2d 616, 624 (D.C. Cir. 1991). 

This is because, as noted supra, NEPA requires the Forest 

Service to identify in its EIS all federal permits that the

 

27. Nor is RESTORE precluded from pursuing its claims on the
ground that it did not notify defendants of its intent to
bring suit. RESTORE was an intervenor, merely joining a suit
that was already in esse; it did not bring a new suit. As 
such, RESTORE was not required to notify Loon Corp. of its
intent to bring suit. We need look no further than the
statutory language itself: "No action may be commenced" 
without the requisite notice. 33 U.S.C. 1365(b). RESTORE
did not "commence" this action; it intervened in an existing
action. Moreover, the purpose of the notice requirement --
to give the parties an opportunity to resolve the problem
administratively or to settle the matter without resort to
the courts, before the parties have assumed adversarial
positions brought about by litigation -- no longer applied at
the time RESTORE intervened in the ongoing suit. Hence, the
purpose of the notice requirement would not be served by
applying it to an intervenor like RESTORE.

Nor are we faced with the kind of equitable
considerations discussed in Hallstrom v. Tillamook County, 
493 U.S. 20, 29 (1989), in holding an original plaintiff
strictly to the notice requirement. Unlike the original
plaintiff, who has full control over when to file the suit,
an intervenor like RESTORE has no control over the timing of
the initial action. Because this action was already being
litigated on an expedited schedule, RESTORE could well have
lost the opportunity to protect its interests if it had
served a notice of intent to sue and then waited 60 days
before intervening in the expedited case. The balance of
equities here favors permitting RESTORE to pursue its claims.

-58-

project needed in order to comply with applicable federal

law. 40 C.F.R. 1502.25(b). There is no question that

plaintiffs have properly invoked the jurisdiction of this

court, pursuant to 28 U.S.C. 1331 (general federal question

jurisdiction), to challenge defendants' failure to comply

with NEPA in this regard. For these reasons, we reject

defendants' jurisdictional argument and turn to the merits.

B. NPDES Permit B. NPDES Permit 

Section 301(a) of the Clean Water Act prohibits the

"discharge of any pollutant" into navigable waters from any

"point source" without an NPDES permit. 33 U.S.C. 1311(a)

(1994). Plaintiffs argue that the Forest Service violated

Section 301(a) by failing to obtain an NPDES permit before

approving Loon's plan to remove water from the East Branch,

use it to pressurize and prevent freezing in its snowmaking

equipment, and then discharge the used water into Loon Pond.

Section 301(a) prohibits the "discharge of any pollutant by

any person" except as authorized pursuant to a permit issued

under the Act. Id.; see 33 U.S.C. 1342, 1344 (1994); 

Commonwealth of P.R., 721 F.2d at 835. The term "discharge 

of a pollutant" is defined as "any addition of any pollutant

to navigable waters from any point source." 33 U.S.C. 

1362(12)(A) (1994). The definition of a "pollutant" includes

"dredged spoil, solid waste, . . . sewage, garbage, . . .

biological materials, . . . heat, . . . sand, . . . and

-59-

agricultural waste." 33 U.S.C. 1362(6) (1994). "Navigable

waters" is defined as "the waters of the United States." 33

U.S.C. 1362(7) (1994). The district court found and the

parties agree that Loon Pond is a water of the United States,

that the East Branch water discharged from Loon Corp.'s

snowmaking pipes into Loon Pond is a pollutant within the

meaning of the CWA,28 and that the pipe discharging the water

into Loon Pond is a point source. The question, then, is

whether there is an "addition" of pollutants to Loon Pond

when water containing pollutants is discharged from Loon

Corp.'s snowmaking equipment into Loon Pond.

The district court answered this question in the

negative. The court reasoned that the intake water from the

East Branch of the Pemigewasset River and the water in Loon

Pond are all part of "a singular entity, 'the waters of the 

United States,'" and therefore that "the bodies of water are

not to be considered individually in this context."

Memorandum and Order at 13. Because it interpreted the East

Branch and Loon Pond to be part of the same "singular

entity," the court concluded that the transfer of water from

the East Branch into Loon Pond would not constitute an

 

28. It contains at least the same pollutants that were
present in the water from the East Branch before intake into
the pipes.

-60-

"addition" into the Pond, at least if the pipes added no new

pollutants.29 Id. 

There is no basis in law or fact for the district

court's "singular entity" theory. The error in the court's

reasoning is highlighted by an analogy the court drew: it

hypothesized a pond in which "we place a pipe . . . and we

pump the pond water from the bottom to the surface. No one

would reasonably contend that internal pumping causes an

'addition' of pollutants to the pond. Instead, we would

consider the pumping to be a redistribution of pollutants

from one part of the pond to another." Id. at 12. Such a 

situation is not at all analogous to the instant case. There

is no barrier separating the water at the top of a pond from

the water at the bottom of the same pond; chemicals,

 

29. This premise is a disputed issue. Plaintiffs argue that
allowing the water from the East Branch to flow through the
pipes before discharge into Loon Pond results in the addition
of not insignificant amounts of oil and grease. Defendants
dispute this, which ordinarily would result in a reversal of
summary judgment on this issue. See Fed. R. Civ. P. 56(c). 
Defendants argue, however, that plaintiffs failed to raise
this factual dispute before the agency in timely fashion, so
it is not preserved for our review. Plaintiffs respond that
they could not have raised this dispute prior to the
publication of the FEIS because the Forest Service did not
even collect the data regarding oil and grease until after
issuing its decision (the ROD). We need not resolve this
dispute; we hold infra that, even if the pipes add no new 
pollutants, the transfer of East Branch water through Loon
Corp.'s privately owned pipes and its discharge into Loon
Pond constitutes a point source discharge of at least some
pollutants into the Pond, thereby requiring an NPDES permit.
Upon remand, the parties are not foreclosed from presenting
their factual disputes to the EPA if they decide to contest
the issuance of that permit.

-61-

organisms, and even heat are able to pass from the top to the

bottom or vice versa, at rates determined only by the laws of 

science. 

In contrast, the transfer of water or its contents

from the East Branch to Loon Pond would not occur naturally.

This is more analogous to the example the district court gave

from the opposite end of the spectrum: where water is added

"from an external source" to the pond and an NPDES permit is

required. Id. As in this converse example, the East Branch 

and Loon Pond are not the same body of water; the East Branch

is indeed a source "external" to Loon Pond. We can take

judicial notice that the Pemigewasset River was for years one

of the most polluted rivers in New England, the repository

for raw sewage from factories and towns. It emitted an

overwhelming odor and was known to peel the paint off

buildings located on its banks. Yet, under the district

court's theory, even if such conditions still prevailed, a

proposal to withdraw water from the Pemigewasset to discharge

it into Loon Pond would be analogous to moving water from the

top to the bottom of a single pond; it would not constitute

an "addition" of pollutants "from an external source" because

both the East Branch and Loon Pond are part of the "singular"

waters of the United States.30 The district court apparently

 

30. Again, we leave to one side the possibility that
additional pollutants, such as oil and grease, would be added
when the water flowed through the system of pipes. If that

-62-

would reach the same conclusion regardless of how polluted

the Pemigewasset was or how pristine Loon Pond was. We do

not believe Congress intended such an irrational result.

The district court's analysis also ignores the fact

that water would pass through Loon Corp.'s privately owned

pipes on its way from the East Branch to Loon Pond. Thus,

nature would not regulate -- and neither the Forest Service

nor the court could know in advance -- whether any pollutants

would be added to the water as it passes through the pipes.

The district court concluded that the East Branch water does

not "lose[] its status as navigable waters" even if it is

"commercially exploited," Memorandum and Order at 18, as long

as Loon Corp. does not "plan[] to add any additional

pollutants to the East Branch water that it intends to

discharge into Loon Pond." Id. at 10. The court does not 

indicate whether anyone assures compliance with the "plan"

that no pollutants be added during the commercial

exploitation, or if so who makes that determination and how

it is made, at a time when the project is still just a

proposal and not yet a fait accompli. Cf. Massachusetts v. 

Watt, 716 F.2d at 952. The district court's analysis would 

apply equally if the water passed through a paper mill on its

way to Loon Pond, instead of through snowmaking pipes. And

the analysis is equally unpersuasive in either circumstance.

 

were true, that alone would require an NPDES permit.

-63-

Either way, the water leaves the domain of nature and is

subject to private control rather than purely natural

processes. As such, it has lost its status as waters of the

United States. 

Other courts have held that an NPDES permit is

required before pollutants may be moved from one body of

water of the United States to another. See Dague v. City of 

Burlington, 935 F.2d 1343, 1354-55 (2d Cir. 1991), rev'd in 

part on other grounds, 505 U.S. 557 (1992); Committee to Save 

Mokelumne River v. East Bay Mun. Util. Dist., 13 F.3d 305, 

308-09 (9th Cir. 1993), cert. denied, 115 S. Ct. 198 (1994). 

The Eleventh Circuit has held that such a permit is required

in order to move dredge materials by a point source within 

the same water body. United States v. M.C.C. of Florida, 

Inc., 772 F.2d 1501, 1506 (11th Cir. 1985). 

Even the Forest Service does not support the

district court's conclusion that mere transfers of water from

one water body to another, without more, never result in an

addition of pollutants to waters of the United States. The

Forest Service recognizes that "[i]t is possible that water

transferred between unrelated water bodies of different water

quality would properly be regarded as losing its status as

'water [sic] of the United States,'" requiring a Section 402

permit. Forest Service Brief at 47. We agree. The Forest

Service qualifies this insight, however. It argues that Loon

-64-

Corp. "moves water between hydrologically connected water

bodies containing water of like quality" which, therefore,

does not "introduce pollutants 'from the outside world' into

the receiving waters." Id. Accordingly, the Forest Service 

argues no permit is required. We disagree with the Forest

Service's qualification.

First, there is nothing in the statute evincing a

Congressional intent to distinguish between "unrelated" water

bodies and related or "hydrologically connected" water

bodies. The CWA simply addresses "any addition of any

pollutant to navigable waters from any point source." 33

U.S.C. 1362(12)(A). Nor is the purpose of the CWA served

by means of such a distinction. If anything, the purpose

would be better served by a distinction between de minimis 

transfers of water and transfers which add some not

insignificant amount of pollutants to the transferee water

body. But no such distinction appears in the statute, and to

imply one would thrust some agencies with no expertise on

environmental issues into the role of deciding whether the

CWA's environmental protections should even be considered.31

 

31. As discussed in Part VII(C), infra, in another context, 
the Forest Service argues that it is the EPA, not the Forest
Service, that has the expertise and the congressional mandate
to determine whether a proposed project meets state water
quality standards. We agree. The availability of EPA to
perform this task is another reason why an NPDES permit
should be obtained before the Forest Service approves the
Loon Corp. expansion plan. See note 32 and accompanying 
text, infra. 

-65-

More compellingly, the Forest Service's

"hydrological connectedness" proposal ignores a fundamental

fact about water: the direction of flow. It is true that

Loon Pond and the East Branch of the Pemigewasset River are

"hydrologically connected" in the sense that water from the

Pond flows down and eventually empties into the River. But 

water from the East Branch certainly does not flow uphill 

into Loon Pond, carrying with it the pollutants that have

undisputedly accumulated in the East Branch water from some

of the other sources of water entering the East Branch from

upstream. Under such circumstances, defendants cannot

credibly argue that these water bodies are so related that

the transfer of water from the East Branch to Loon Pond is 

not an "addition" of water from one of the "waters of the

United States" to another. We therefore reject the Forest

Service's "hydrological connectedness" proposal.

Likewise, we reject its assertion, unsupported by

the record, that in some general sense the two bodies of

water are "of like quality." First, this is the kind of

substantive question to which the EPA would apply its

technical expertise in deciding whether to issue an NPDES

permit and what conditions to attach to such a permit in

order to protect water quality. It is not the kind of

threshold question that the Forest Service or this court

-66-

should address in deciding whether to subject the Loon Corp.

expansion proposal to the NPDES permitting process. 

Second, the Forest Service does not contest

plaintiffs' assertion that there are at least some pollutants

in the East Branch that do not exist naturally in Loon Pond.

The Final EIS itself noted that the East Branch has been

designated by the New Hampshire legislature as a Class B

Waterway, a lower quality designation than the Class A

quality rating of Loon Pond. JA, vol. II, FEIS at 91. The

difference in classifications -- the East Branch as a Class B

waterway, Loon Pond as Class A -- evinces a higher quality

level for the Pond than for the River, and belies the Forest

Service's assertion that the two bodies of water are "of like

quality."

Even if the East Branch were rated in the same

general class as Loon Pond (Class A), that would not mean the

two bodies of water were identical in quality, such that an

NPDES permit would be unnecessary. The East Branch contains

different organisms than Loon Pond, inter alia, Giardia 

lambia. Loon Pond is also colder overall than the East

Branch, and its lower depths are significantly colder. The

two bodies of water also have different chemistries,

especially the low level of phosphorus in Loon Pond, which

affects its biological composition. Nor has the Forest

Service argued that all such pollutants would be eliminated 

-67-

before any East Branch water would be pumped up to refill

Loon Pond after depletion by Loon Corp.'s snowmaking. The

Service cannot say, therefore, that the discharge of East

Branch water into Loon Pond would not result in "any

pollutants" being added to the Pond. 33 U.S.C. 

1362(12)(A).

Aside from the difficulty of defining a general

concept such as "of like quality," it would defeat the

purpose of the CWA's permit process to interpret the

statutory language "discharge of any pollutant," 33 U.S.C.  

1311(a), to be implicitly qualified by the phrase "except

when the transferee body of water is of like quality." The

Forest Service is simply wrong to analogize the present

situation to a dam that merely accumulates the same water, 

see National Wildlife Fed'n v. Gorsuch, 693 F.2d 156, 175 

(D.C. Cir. 1982), or a pump storage facility that stores

water from one source in a different place, see National 

Wildlife Fed'n v. Consumers Power Co., 862 F.2d 580, 589-90 

(6th Cir. 1988), as distinguished from moving different water

from one flowing water body into another stationary, colder

body. We cannot allow such a watering down of Congress'

clear statutory protections.

We hold that the Pemigewasset River and Loon Pond

are two distinct "waters of the United States," and that the

proposed transfer of water from one to the other constitutes

-68-

an "addition." Where, as is undisputed here, the discharge

is through a point source and the intake water contains

pollutants, an NPDES permit is required. The Forest

Service's determination to the contrary was arbitrary and

capricious and not in accordance with law. See 5 U.S.C.  

706(2)(A).

C. Violation of State Water Quality Standards C. Violation of State Water Quality Standards 

Plaintiff Dubois claims that state water quality

standards are violated because of the quality of water that

would enter Loon Pond. This water would come from one of two

sources: some of it would come from snowmelt that replaces

the water that Loon Corp. has pumped out of Loon Pond to make

snow; and some would be water that Loon Corp. has taken from

the East Branch for snowmaking and then discharged into Loon

Pond. Dubois contends that Loon Corp.'s snowmaking

operations pose an impermissible threat to Loon Pond because

influxes of East Branch water and snowmelt -- the two

principal sources of water to refill the Pond -- could alter

the Pond's naturally occurring pH, bacteria, oil and grease,

and turbidity levels.

On the merits of the water quality standards issue,

Dubois argues that the CWA requires states to adopt water

quality standards which protect against degradation of the

physical, chemical, or biological attributes of the state's

waters. 33 U.S.C. 1251(a), 1313(d)(4)(B); 40 C.F.R. 

-69-

131.12. The greatest protection is afforded to Outstanding

Resource Waters, including Loon Pond, as to which no

degradation is permitted. 40 C.F.R. 131.12(a)(3); N.H.

Code Admin. R. Env-Ws 437.06. Dubois contends that the ski

resort's proposal to draw down a significant amount of water

changes the physical structure of Loon Pond; that refilling

it with East Branch water containing phosphorus (and through

pipes that might contain oil and grease) or with acidic

runoff would change the Pond's chemical composition; and that

the transfer of organisms such as Giardia lambia and

chemicals such as phosphorus into the Pond would alter its

biological attributes. Because we hold infra that Dubois 

cannot, in a challenge to the Forest Service's FEIS,

collaterally attack the state's certification of compliance

with state water quality standards, we need not reach the

merits of the state water quality standards issue.

Defendants argued in the district court that

Dubois' CWA claim was not properly presented, that Dubois

should have raised his objections by exhausting various

administrative remedies and filing a timely appeal in the New

Hampshire Supreme Court. They argued that the federal agency

(Forest Service) and the federal court lack the authority to

review independently and determine the validity of

requirements imposed under state law or in a state's 401

certification, see 33 U.S.C. 1371(c)(2)(A) (1994), and that 

-70-

such authority is expressly delegated to the states, 33

U.S.C. 1341(a) (1994). 

The district court agreed. It held that, "[i]f the

plaintiffs in this case were dissatisfied with the state's 

1341 certification, they could have challenged the

certification by exhausting state administrative remedies and

filing a timely challenge in the New Hampshire Supreme

Court." Memorandum and Order at 21-23. That is true insofar

as it goes. The question, however, is whether a state court

action is the plaintiffs' only recourse, or whether, in the 

alternative, they had a right to challenge in federal court

the federal agency's issuance of a federal permit in reliance

on the state certification, where the basis for their

challenge is that the project fails to meet the minimum

standards of the federal Clean Water Act.

Defendants may be correct that the cases they rely

upon hold that the state courts are the only fora in which to

challenge whatever requirements the state adds, beyond the 

minimum required by the CWA. Those cases do not, however,

deprive the federal courts of jurisdiction to hear a claim

that defendants have violated the floor level of clean water 

requirements imposed by the CWA, i.e., the requirements which 

the state regulations share with the federal CWA. 

-71-

The cases relied upon by the defendants and by the

district court32 dealt with challenges to the state's

imposition of more stringent controls on a project's water 

pollution effluent. Such cases relied on the language of the

CWA itself, as well as basic principles of federalism, to

support their holdings that the CWA "empower[s]" the states

"to set more stringent water quality standards than those set

by the Act and its attendant requirements" to prevent water

pollution. Marathon Dev. Corp., 867 F.2d at 99; see 

Commonwealth of P.R., 721 F.2d at 834 n.3; Roosevelt 

Campobello, 684 F.2d at 1056. However, the states may not 

set standards that are less stringent than the CWA's. See 

Marathon Dev. Corp., 867 F.2d at 99. Simply put, the CWA 

provides a federal floor, not a ceiling, on environmental

protection. If a state seeks to approve a standard that is

less stringent than the federal CWA's floor, or seeks to

apply a standard in a way that is otherwise invalid under

federal law, then federal agencies and federal courts are 

obligated to resolve the application of the federal CWA in

 

32. They rely particularly on our Roosevelt Campobello 
decision, 684 F.2d at 1056, but also on Puerto Rico Sun Oil, 
8 F.3d at 81; United States v. Marathon Dev. Corp., 867 F.2d 
96, 102 (1st Cir. 1989); Lake Erie Alliance for Protection of 
Coastal Corridor v. U.S. Army Corps of Eng'rs, 526 F. Supp. 
1063, 1074 (W.D.Pa. 1981), aff'd mem., 707 F.2d 1392 (3d 
Cir.), cert. denied, 464 U.S. 915 (1983). All of these cases 
involved states imposing more stringent controls on water
pollution than required by federal law.

-72-

any case that properly comes before them. See Keating v. 

FERC, 927 F.2d at 624. 

The Forest Service asserts another defense, also

relied on by the district court, which carries more force.

Section 511(c)(2)(A) of the CWA precludes federal agencies

from invoking NEPA to authorize their review of "the adequacy

of any certification under section [401]." 33 U.S.C. 

1371(c)(2)(A). Dubois points out that, in the circumstances

of this case, Section 511(c)(2)(A) does not apply when the

discharge of pollutants in question is not regulated by

effluent limitations established under CWA Sections 301(b)

and 302, 33 U.S.C. 1311(b) & 1312, or by an applicable

standard of performance under CWA Sections 306 and 307, 33

U.S.C. 1316 & 1317. Dubois Brief at 27; see 33 U.S.C.  

1341(a). Such effluent limitations and standards are

established in NPDES permits for point source dischargers.

33 U.S.C. 1311(b), 1312, 1316, 1317, 1362(11). Dubois

then tries to bootstrap the fact that the Forest Service

failed to apply for an NPDES permit into a circumstance that

renders Section 511(c)(2)(A) inapplicable. Dubois Brief at

27-28. His argument is without merit. 

It is true that the Forest Service was obligated to

obtain an NPDES permit before permitting Loon Corp. to expand

its ski resort. See Part VII(B), supra. However, the 

violation of that statutory obligation is a separate issue

-73-

from the state water quality standards issue. For purposes

of the latter, the fact is that there do not exist any

effluent limitations under CWA Sections 301(b) or 302 nor any

standards of performance under CWA Sections 306 or 307 that

apply to the discharge of East Branch water and pollutants

into Loon Pond. Therefore, whether or not the Forest Service

actually obtained the required NPDES permit, Section

511(c)(2)(A) applies, and Dubois' challenge to the adequacy

of the state's Section 401 certification may not proceed in

this court. 

As the federal defendants argued in their brief and

as we held in Roosevelt Campobello, 684 F.2d at 1056, Dubois' 

challenge must be addressed as part of EPA's "independent

obligation to ensure that EPA-issued NPDES permits meet state

water quality standards." Forest Service Brief at 29; see 33 

U.S.C. 1311(b)(1)(C) (1994).33 If, upon remand, EPA

determines that a permit is appropriate, with or without

 

33. The availability of EPA to perform this task is another
reason supporting our holding in Part VII(B), supra, that an 
NPDES permit is required. See supra note 30. The federal 
CWA requires that any state certification ensure that the
minimal federal standards have been adhered to. The
government is correct that the Forest Service possesses
neither the congressional mandate nor the expertise to
second-guess state water quality certifications. But EPA
does; and the CWA envisions that EPA make those assurances in
the context of deciding whether to issue an NPDES permit.

-74-

conditions or limitations,34 and if plaintiffs disagree with

EPA's decision, then they may challenge such decision in any

manner that is available to them at the time. But EPA, not

the Forest Service, is the proper entity to evaluate

compliance with state water quality standards.

CONCLUSION CONCLUSION 

We affirm the district court's denial of defendant

Loon's motion to dismiss plaintiff Dubois' complaint for

failure to meet his burden of establishing his standing to

sue.

We reverse the district court's grant of summary

judgment in favor of defendants and reverse the district

court's denial of summary judgment in favor of plaintiffs,

with 

 

34. Whether or not the NHDES certifies that state water
quality standards have been met, EPA would be "bound to
include in the federal permit 'any more stringent limitations
. . . established pursuant to any State law or regulations
(under authority preserved by section 510).'" Roosevelt 
Campobello, 684 F.2d at 1056 (quoting 33 U.S.C.  
1311(b)(1)(C)).

-75-

respect to 

(1) the NEPA/EIS issue relating to consideration of

alternatives, 

(2) the supplemental EIS issue, and 

(3) the NPDES permit issue. 

We affirm the district court's grant of summary

judgment in favor of defendants and affirm the district

court's denial of summary judgment in favor of plaintiff

Dubois, with respect to the alleged violations of 

(1) Executive Order 11,990, and 

(2) state water quality standards under the CWA.

Affirmed in part; reversed in part; remanded; costs Affirmed in part; reversed in part; remanded; costs 

on appeal awarded to plaintiffs. on appeal awarded to plaintiffs. 

-76-